IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JOHN B. STROMP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 11-cv-56-TLW |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff John B. Stromp, pursuant to 42 U.S.C. §§ 405(g), 416(i), and 1382, requests judicial review of the decision of the Commissioner of the Social Security Administration denying his application for disability benefits under Title XVI of the Social Security Act ("Act"). In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge. (Dkt. # 8). Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.

## Review

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. § 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A plaintiff is disabled under the Act only if his or her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations

implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

The role of the court in reviewing a decision of the Commissioner under 42 U.S.C. § 405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the [Administrative Law Judge] [("]ALJ["])]'s findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. § 416.908. The evidence must

come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. § 416.913(a).

## Background

Plaintiff was born January 27, 1966 and was 43 years old at the time of ALJ John Volz's final decision on June 23, 2009. (R. 86, 92). He is 6'4" tall, and weighs 250 lbs. (R. 95). Plaintiff graduated high school in 1983. (R. 99). Plaintiff's prior work history consists mainly of construction work. (R. 37, 130). Plaintiff protectively filed a Title XVI claim on August 6, 2007, alleging a disability onset date of May 1, 2007. (R. 86, 92). Plaintiff had a hearing before the ALJ on June 1, 2009. The ALJ issued his decision on June 23, 2009, denying plaintiff's claim for benefits. Plaintiff appealed that decision to the Appeals Council, which declined to review the decision of the ALJ. (R. 1-5).

## Hearing Summary

Plaintiff testifies he stopped working in construction "and outdoor work" when he learned he was diabetic two years prior to the hearing. (R. 20-21). He testifies to sharp pain in his stomach, which he also describes as constant pressure, creating nausea and weight loss. He says he is scheduled to have a "scope" the week following the hearing. (R. 21-22). He went on to describe diabetic neuropathy which affects his hands, feet, legs, and arms. He says his normal blood sugar readings were around 220. Plaintiff states he is compliant with his medication and diabetic diet. (R. 23). He claims he could walk 50 to 100 feet before pain makes him stop. He claims standing and sitting are both affected by his diabetes, and he is most comfortable alternating between lying down, sitting, and walking. (R. 25).

The ALJ asked plaintiff about any drinking problems, which he denied, saying he never had a problem with alcohol, and explained he drank in high school and college, but that was over 20 to 25 years before. (R. 27).

Plaintiff discusses adverse effects of his high blood pressure, explaining his doctors have unsuccessfully tried several medications to control it. (R. 24, 30). He mentions an issue with his heart, trouble sleeping, and headaches. (R. 32, 33). He states he feels he would be able to lift 20 pounds with no problem. (R. 32). He claims to be unable to focus on a two-hour movie and that his depression and anxiety factor into his inability to work. (R. 34-35). Plaintiff is able to drive and owns a car, but said he does not drive very far. (R. 35).

The vocational expert ("VE") testified plaintiff's former work as a construction laborer was classified as heavy exertion and unskilled. (R. 37). The ALJ then posed a hypothetical person of plaintiff's "age, educational background, and prior work experience who could occasionally lift 50 pounds, frequently lift 25 pounds, stand and/or walk six hours in an eight-hour workday, sit six hours in an eight-hour workday, unlimited other than shown, lift and carry, except for those limitations in weight," and asked if there were jobs in the regional or national economy such a person could perform. The VE found plaintiff would be unable to perform his previous work, but would be able to perform the medium exertion jobs of janitorial work and machine operator, and the sedentary job of assembly work. (R. 37-38).

**Medical Records**

Plaintiff presented to Clinico, LLC, Rural Health Clinic eleven times between October 27, 2006 and August 27, 2007, was tested and treated for high blood pressure, diabetes, liver disease, and an abnormal ultrasound of his gall bladder. (R. 141-165). He was referred to a

gastroenterologist, but was unable to afford to go, so doctors told his wife to contact both OU and OSU medical centers for possible treatment. (R. 143).

On November 7, 2007, plaintiff presented to Ronald Schatzman, M.D. for a consultative examination. (R. 166-171). Dr. Schatzman conducted a general review of plaintiff's systems, noting plaintiff was "remarkable for diabetes, fainting, dizzy spells, muscle pain, indigestion, constipation, gallstones, hypertension, and rapid heartbeat." (R. 166). Upon examination, he noted the majority of plaintiff's systems were normal. He noted grip strength of "5/5 bilaterally strong and firm," and that plaintiff could perform gross and fine tactile manipulations. (R. 168). Plaintiff's heel/toe walking was noted to be difficult, but within normal limits. His cervical, thoracic, and lumbar-sacral spines were all non-tender with a normal range of motion, with negative straight leg testing bilaterally. Dr. Schatzman also noted decreased sensation to mid-thigh in plaintiff's legs, paresthesias[1] up his legs to his knees, and decreased sensation in his hands to the wrists. Id. Dr. Schatzman noted plaintiff had a stable gait, but "walk[ed] as though he ha[d] sore feet." Id. Plaintiff's range of motion charts were normal. (R. 169-171). Plaintiff was diagnosed with hypertension, diabetes mellitus, peripheral neuropathy,[2] tobacco abuse, and possible alcohol abuse in the past. (R. 168).

On December 6, 2007, plaintiff presented to Morton Comprehensive Health Services, Inc. to "establish care," with complaints of numbness and tingling bilaterally in his lower extremities, heartburn. (R. 181-191). Plaintiff listed his history of type 2 diabetes with

---

[1] Paresthesia is defined as a burning, prickling, itching, or tingling skin sensation with no discernible cause. See http://medical-dictionary.thefreedictionary.com/paresthesia last visited April 30, 2012.

[2] Peripheral neuropathy associated with diabetes is nerve damage which usually affects the arms, hands, legs, and feet. It is known to present with or without symptoms of pain.
See http://www.foothealthfacts.org/footankleinfo/diabetic_peripheral_neuro.htm last visited April 30, 2012.

neuropathy, and explained his previous primary care physician prescribed Neurontin for the tingling and numbness, but plaintiff could not afford it. He requested a refill of Lortab, which he used for neuropathic pain. After examination, Njanja Ruenji, P.A. assessed plaintiff with type 2 diabetes, diabetic neuropathy, and GERD. Plaintiff's treatment plan included adding prescriptions of Omeprazole (to treat GERD), and Neurontin (to treat neuropathic pain), to his current medications (including Humulin, an insulin; Enalapril for high blood pressure; Tramadol for moderate to severe pain; Neurontin for neuropathic pain; and Lortab for pain), lab work, a referral to a pain management specialist, and smoking cessation. (R. 181-182).

On December 17, 2007, Luther Woodcock, M.D. completed a physical RFC form regarding plaintiff. (R. 172-179). Dr. Woodcock gave plaintiff the RFC to occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, sit, stand, and/or walk, with normal breaks, each for six hours in an eight hour workday. There were no push and/or pull restrictions. Dr. Woodcock adopted most of the results of plaintiff's November 7, 2007 consultative examination with Dr. Schatzman. Dr. Woodcock listed no postural, manipulative, visual, communicative, or environmental limitations.

Plaintiff visited CREOKS Mental Health Center twice between January 4, 2008 and March 3, 2008. (R. 193-203). His initial Axis diagnoses were: I-major depressive disorder, recurrent, severe, and generalized anxiety disorder; II-none; III-diabetes (insulin dependent), high blood pressure, and neuropathy; IV-social environment, economic, and access to healthcare services; and V-GAF of 52. These did not change on his second visit. Although it is noted on a section named "Discharge Plan" that plaintiff's expected date of discharge would be March, 2009, no further records of treatment from CREOKS are found in the file.

Next, Denise LaGrand, Psy.D., performed a mental consultative examination of plaintiff for the administration on April 1, 2008. (R. 204-210). No mental health records for plaintiff were provided. (R. 204). Dr. LaGrand noted plaintiff's physical appearance, that his hygiene was appropriate, he had no noticeable physical handicaps, his posture, gait and motor activity were normal, no unusual mannerisms or involuntary movements were noticed, his facial expression and eye contact were appropriate, and he was cooperative, alert, and responsive to his surroundings. (R. 205-206). She noted during her examination that though plaintiff had complained of memory problems interfering with his ability to function, he had no significant difficulty with the exam memory tasks. Plaintiff reported feeling sad, and reported suicidal ideations. Her diagnostic impression was Axis I-pain disorder due to his general medical condition, major depressive disorder, moderate; Axis II-no diagnosis; Axis III-deferred; Axis IV-occupational problems; and Axis V-GAF score of 55.

Based on testing, Dr. LaGrand noted plaintiff's ability to concentrate to be low average with no significant problems with persistence or pace; his IQ was estimated in the low average range, and his functioning was consistent with this IQ; his ability to maintain appearance was adequate; reliability was fair; his ability to communicate and interact socially was adequate; his abilities to function independently and cope with typical work-like mental/cognitive demands were adequate; his abilities to sustain concentration and persistence on basic skills, and to timely complete work-like tasks, were fair. Dr. LaGrand noted plaintiff's reported mental/emotional symptoms did not appear to affect his performance. (R. 208). She stated based from a psychological standpoint, overall, plaintiff possessed a "low average" ability to perform adequately in most job situations, and handle the stresses associated with a normal work setting. Id. Dr. LeGrand estimated plaintiff to have a fair chance to improve his condition with "adequate

treatment, relief from pain, medical intervention for his physical problems, counseling, parenting, and appropriate psychotropic medication." (R. 209).

Kathleen Gerrity, Ph.D. completed a Psychiatric Review Technique form for plaintiff on April 24, 2008. (R. 212-225). She evaluated him for category 12.04, Affective Disorders. The impairment was rated "not severe." (R. 212). She rated plaintiff with mild restriction in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. No episodes of decompensation were found. (R. 222). In her notes, Dr. Gerrity first noted plaintiff did not allege any mental problems in his initial application documents, but alleged "'more anxiety and depression', and 'confused [and] can't remember things'" at the reconsideration level. She discussed several pieces of evidence from plaintiff's records, and summarized Dr. LaGrand's mental consultative examination. (R. 224). Dr. Gerrity also completed a Case Analysis form the same date, noting a not severe rating on plaintiff's psychiatric diagnosis for category 12.04. (R. 211).

Ernestine Shires, M.D. completed a Case Analysis form for plaintiff's physical allegations on April 24, 2008 affirming the physical RFC assessment by Dr. Woodcock dated December 17, 2007. (R. 226).

Next, plaintiff's medical records jump forward to April 20, 2009, when Kevin Baker, D.O., of OSU Medical Center, reviewed an x-ray of plaintiff's abdomen on complaints of abdominal pain. Dr. Baker's impression was "probable right mid and upper small bowl ileus;[3] recommend clinical follow up." (R. 244). He was discharged April 21, 2009 with medications and instructions regarding both his blood pressure and sugar levels, with no activity level

---

[3] An ileus is a type of obstruction. See http://medical-dictionary.thefreedictionary.com/ileus, last visited April 23, 2012.

restrictions beyond "exercise/activity as tolerated." (R. 228). Records indicate plaintiff visited OSU Medical Center eight times between April 21, 2009 and August 4, 2009.[4] (R. 229-253). His complaints of stomach pain were evaluated by Brian C. Diener, D.O., who recommended an esophageal scope procedure and a CT scan. (R. 246-249). Plaintiff was diagnosed by various doctors at OSU with uncontrolled diabetes mellitus, diabetic neuropathy, tobacco abuse, and uncontrolled high blood pressure. (R. 232, 237, 239, 241, 243). Medications were prescribed and adjusted during this time. One chart notation mentions plaintiff has a history of drug and alcohol abuse. (R. 242).

## Procedural History

Plaintiff alleges his disabling impairments include hypertension, diabetes, neuropathy pain, dizziness, and depression. (R. 95, 114, 124). In assessing plaintiff's qualifications for disability, the ALJ determined plaintiff had not engaged in substantial gainful activity since his application date of August 6, 2007. At step two, he found plaintiff suffered the severe impairments of diabetes mellitus and peripheral neuropathy. Applying the "special technique" at step two, the ALJ determined plaintiff's "medically determinable mental impairment of depression does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore nonsevere." (R. 12). At step three, the ALJ determined plaintiff's impairments, singularly and in combination, did not meet or equal a listed impairment, focusing on listing 9.08, Diabetes Mellitus. (R. 13).

Before moving to step four, the ALJ found plaintiff retained the residual functional capacity ("RFC") to perform the full range of medium work "as defined in 20 C.F.R. 416.967(c)," that he could lift and/or carry 50 pounds occasionally, 25 pounds frequently, and

---

[4] Plaintiff's attorney submitted these records to the Appeals Council on August 24, 2009. (R. 230).

stand, walk, or sit for a total of six hours of an eight hour workday. Id. At step four, the ALJ found plaintiff was unable to perform any of his previous work, but at step five, found jobs in significant numbers plaintiff was capable of performing, thereby finding him not disabled from August 6, 2007 through June 23, 2009, the date of his decision. (R. 15-16).

## Issues Raised

Plaintiff's allegations of error are as follows:

1. The ALJ failed to make a proper determination at step five of the sequential evaluation process,
2. The ALJ failed to properly consider the medical evidence of record, and
3. The ALJ failed to perform a proper credibility determination.

(Dkt. # 12 at 1).

## Discussion

**The ALJ's Step 5 Analysis**

Plaintiff's step five allegation of error is two-fold. First, plaintiff alleges that the ALJ improperly applied the Medical-Vocational Guidelines ("Grids") by failing to consider plaintiff's nonexertional impairments of pain and depression. His second step five allegation of error is that the ALJ failed to consider all of plaintiff's impairments throughout all five steps, consequently determining a faulty RFC. Plaintiff argues the ALJ failed to include his nonexertional limitations of mental impairments (although mild), and pain in his RFC determination, and further failed to consider the same impairments in his application of the Grids. (Dkt. # 12 at 2-3). Defendant counters by presenting several arguments that appear to "bridge the gap" for the ALJ, which is not permitted. (Dkt. # 16 at 2). The Court finds plaintiff's arguments to be persuasive.

Plaintiff argues it was improper for the ALJ to apply the Grids conclusively to determine plaintiff was not disabled because plaintiff's nonexertional impairments of pain, dizziness, lightheadedness, and mild mental impairment were not taken into account. Defendant counters

10

that if a claimant's nonexertional impairments do not significantly reduce the range of available jobs, an ALJ is permitted to rely conclusively on the Grids, citing Evans v. Chater, 55 F.3d 530, 532-533 (10th Cir. 1995). Defendant also argues plaintiff is required to show more than the presence of an impairment, citing Hinkle v. Apfel, 132 F.3d 1349, 1352 (10th Cir. 1997).

"[A]n ALJ may not rely conclusively on the grids unless he finds ... that the claimant has no significant nonexertional impairment," and the finding is supported by substantial evidence. Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir.1993).

SSR 96-7p identifies seven areas to be evaluated to assist the ALJ in accurately assessing a claimant's symptoms. These include daily activities; the location, duration, frequency, and intensity of pain or other symptoms; factors that bring on and aggravate the symptoms; medications used and their side effects, etc.; treatment other than medication for relief; any other measures tried for relief; and any other factors regarding functional limitations and/or restrictions due to pain or other symptoms. SSR 96-7p, 1996 WL 374186. Although the record clearly supports the ALJ's application of the grids when considered in light of the foregoing factors, the ALJ failed to explain his findings in these areas. Thus, the Court must remand for the ALJ to explain how plaintiff's nonexertional impairments of pain,[5] and mild mental impairment impact his decision at step five, if at all.

Regarding his RFC determination, plaintiff argues the ALJ failed to include his nonexertional limitations of mental impairments (although mild), and pain. (Dkt. # 12 at 2-3). Defendant counters by stating "[a] hypothetical question need only include the limitations in the

---

[5] Just a diagnosis of diabetic neuropathy is not objective medical evidence of pain from the condition. The Court recognizes diabetic neuropathy can be present with or without pain. Nerve tests can be performed for a proper evaluation any nerve damage and/or pain. From a thorough review of the record, the Court fails to find any objective tests that confirm plaintiff's subjective complaints of pain.

properly determined RFC finding. Gay v. Sullivan, 986 F.2d 1336, 1341 (10th Cir. 1993)." (Dkt. # 16 at 2). The plaintiff's arguments have merit.

At step two, the ALJ determined plaintiff had the severe impairments of diabetes mellitus and peripheral neuropathy, both of which are well documented in the record. Next, still at step two, the ALJ considered plaintiff's mental impairment of depression. After applying the "special technique," he determined plaintiff's depression imposed no more than a minimal limitation on his ability to perform basic work activity. (R. 12-13).

At step two, the burden of proof belongs to the plaintiff.[6] Plaintiff's records show two visits to CREOKS Mental Health Center early in 2008, with no record of any mental health treatment before or after. (R. 193-203). On a Disability Report-Appeal form, plaintiff reported he was taking Paxil and Trazodone for depression, prescribed by Dr. Vanessa Werlla at CREOKS. (R. 126). There are several notations in the medical records of complaints or diagnoses of depression from plaintiff and his various doctors. (R. 181, 186, 188, 204, 206, 208, 224, 247). The only examining opinion evidence in the record regarding plaintiff's mental health is the consultative examination performed by Dr. LaGrand on April 1, 2008. Dr. LaGrand's examination results appear to be, in large part, the basis for Dr. Gerrity's conclusions as stated in the Psychiatric Review Technique form. Dr. Gerrity rated plaintiff as having mild restriction in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, and he found no episodes of decompensation, which are the restrictions the

---

[6] A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. § 416.912(a).

ALJ adopted at step two to find plaintiff's depression to be nonsevere.[7] (R. 12-13, 222). The ALJ's step two determination is supported by the record and is affirmed.

However, the only RFC discussion of plaintiff's mild mental impairments and pain is found in what appears to be the ALJ's credibility explanation, where the ALJ states:

> Mr. Stromp has few treatment records and no longitudinal history of treatment. Consultative psychologist Denise, LaGrand, Psy.D. opined after seeing the claimant that his application seemed to be based primarily on physical factors. She believed that his capacity to cope with the typical mental/cognitive demands of basic work-like tasks was adequate. Dr. LaGrand did not perceive Mr. Stromp having significant problems with persistence or pace (Exhibit 7F, p. 5). From CREOKS, where he received mental health assistance in the first three months of 2008, Mr. Stromp was diagnosed with depression and anxiety. But, he claimed he got along with others fairly well and that he had a good relationship with his live-in girlfriend (Exhibit 6F, p. 1). Except for some mental abuse in his youth from his father, there did not appear to be any history of psychological trauma (Exhibit 6F, p. 8).
>
> The claimant's most limiting impairment appears to be diabetic neuropathy. Yet, there is scant evidence of treatment for the condition. Dr. LaGrand observed that Mr. Stromp denied having any difficulty with dressing, preparing food, shopping, driving, or performing household chores. He had apparently abandoned hunting, fishing, and sports because of alleged pain. But, Dr. LaGrand wrote that she had not seen him having any noticeable physical handicap. His posture, gait, and motor activity were normal while his thought process showed no indication of active psychosis (Exhibit 7F, p. 3).

(R. 14). Although the ALJ's analysis is sufficient, he failed to mention how his analysis impacted his RFC determination, if at all. Thus, the Court is unable to determine whether the ALJ found that plaintiff's non-exertional limitations do not impact plaintiff's RFC or whether he simply forgot to take them into account.

**Medical Evidence Analysis**

Initially, plaintiff challenges the opinion weight assigned to the medical opinions in the record; however, he then attempts to introduce a new diagnosis of a somatoform disorder as an

---

[7] The ALJ's analysis at step two is affirmed.

13

overlooked issue. After a careful review of the record, the Court notes plaintiff was never diagnosed by any physician with a somatoform disorder and declines to instruct the ALJ to assume one on remand. However, the Court finds plaintiff's argument as to the weight given to the medical opinions in the record to have merit.

As to plaintiff's physical impairments, the ALJ appears to give some weight to the opinion of consultative examiner "Nelson Onaro, D.O.," stating Dr. Onaro:

> … listed the claimant's symptoms in a consultative evaluation report dated November 7, 2007. These were syncope, dizziness, hypertension, rapid heartbeat, indigestion, constipation, and gallstones. Mr. Stromp had the full range of motion in his back, neck, and joints. His heel/toe walking was difficult but within normal limits. Grip strength was 5/5 bilaterally and firm. The claimant was able to perform gross and fine tactile manipulation (Exhibit 2F).

(R. 14-15). Although the agency consultative examination was performed on November 7, 2007, it was performed by Ronald Schatzman, M.D., not Nelson Onaro, D.O. In addition, the symptoms the ALJ recited as plaintiff's complaints were not his primary complaints. His primary complaints to Dr. Schatzman consisted of "diabetes mellitus, hypertension, and peripheral neuropathy." Plaintiff complained of falls in the past, and informed Dr. Schatzman that he was previously employed working on "high towers." (R. 166). Dr. Schatzman noted plaintiff's "review of systems is remarkable for diabetes, fainting, dizzy spells, muscle pain, indigestion, constipation, gallstones, hypertension, and rapid heartbeat." Id. Dr. Schatzman diagnosed plaintiff with hypertension, diabetes mellitus, peripheral neuropathy, tobacco abuse, and possible prior ethanol abuse. (R. 168).

The ALJ only mentions plaintiff's treating physicians at Morton Comprehensive Health Services to note these physicians "urged [plaintiff] to cease his pack a day smoking habit of over 25 years (Exhibit 4F, p. 2). There were no overt problems concerning his breathing and/or lung capacity." (R. 14). Plaintiff's complaints to Morton Health, however, related to his diabetes,

neuropathy, pain, and heartburn. He was diagnosed with Type 2 diabetes, diabetic neuropathy, GERD, and "smoking cessation." (R. 181). He received a referral to "pain management for his chronic pain," was instructed to continue his present medications, and placed on additional prescription medications for GERD and pain. (R. 182).

The ALJ failed to fully discuss any of this evidence, and failed to explain the weight given to any opinion. It appears he relied very heavily on the consultative mental examination performed by Dr. LaGrand, and the physical RFC form completed by Dr. Woodcock; and somewhat on the consultative physical examination of Dr. Schatzman, but the ALJ must explain his reasoning in a manner that does not leave areas of speculation open to the Court. Therefore, the Court remands this issue to the ALJ to explain what weight he afforded the opinion evidence of Dr. Schatzman's consultative physical examination (R. 166-171); Dr. LaGrand's mental consultative examination (R. 204-210); Dr. Woodcock's physical RFC opinion; as well as what evidence he chose not to rely on in formulating his ultimate RFC determination.

**Credibility**

Finally, plaintiff complains the ALJ failed to properly consider his credibility. The Court disagrees. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence. However, [f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995) (quotation and citation omitted). The ALJ must "explain why the specific evidence relevant to each factor led him to conclude claimant's subjective complaints were not credible." Id. The ALJ is allowed to consider objective factors, such as attempts to find relief, use of medications,

regular contact with doctors, and daily activities when determining a claimant's credibility. Luna v. Bowen, 834 F.2d 161, 165-66 (10th Cir. 1987).

Here, the ALJ found as follows:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment
>
> Mr. Stromp has few treatment records and no longitudinal history of treatment. Consultative psychologist Denise LaGrand, Psy.D. opined after seeing the claimant that his application seemed to be based primarily on physical factors. She believed that his capacity to cope with the typical mental/cognitive demands of basic work-like tasks was adequate. Dr. LaGrand did not perceive Mr. Stromp having significant problems with persistence or pace (Exhibit 7F, p. 5). From CREOKS, where he received mental health assistance in the first three months of 2008, Mr. Stromp was diagnosed with depression and anxiety. But, he claimed he got along with others fairly well and that he had a good relationship with his live-in girlfriend (Exhibit 6F, p. 1). Except for some mental abuse in his youth from his father, there did not appear to be any history of psychological trauma (Exhibit 6F, p. 8).
>
> The claimant's most limiting impairment appears to be diabetic neuropathy. Yet, there is scant evidence of treatment for the condition. Dr. LaGrand observed that Mr. Stromp denied having any difficulty with dressing, preparing food, shopping, driving, or performing household chores. He had apparently abandoned hunting, fishing, and sports because of alleged pain. But, Dr. LaGrand wrote that she had not seen him having any noticeable physical handicap. His posture, gait, and motor activity were normal while his thought process showed no indication of active psychosis (Exhibit 7F, p. 3).

(R. 14-15). Clearly, the ALJ linked his credibility determination to specific evidence in the record. Given the deference afforded the ALJ in this area, the Court affirms his credibility determination.

## **Conclusion**

For the foregoing reasons, this case is REVERSED and REMANDED for further consideration.

SO ORDERED this 3rd day of May, 2012.

_____<br>
T. Lane Wilson<br>
United States Magistrate Judge